UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DEBORAH ANN FIORILLO | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:13-cv-1287 (VLB) |
| | : | |
| UNITED TECHNOLOGIES CORP., | : | March 21, 2016 |
| SIKORSKY AIRCRAFT CORP., | : | |
| ARIEL R. DAVID, LISA LAFFERTY, | : | |
| NATALIE MORRIS, CHRISTIAN | : | |
| MEISNER, AND LIBERTY LIFE | : | |
| ASSURANCE OF BOSTON, | : | |
| Defendants. | : | |

MEMORANDUM OF DECISION GRANTING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT [Dkt. #117]

Plaintiff Deborah Ann Fiorillo ("Fiorillo") brings federal disability

discrimination, hostile work environment, and equal protection claims under,

respectively, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §

12101, *et seq.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*,

and 28 U.S.C. § 1983, and related state law claims against Defendants United

Technologies Corp. ("UTC"), Sikorsky Aircraft Corp. ("Sikorsky"), Ariel R. David

("David"), Lisa Lafferty ("Lafferty"), Natalie Morris ("Morris"), and Christian

Meisner ("Meisner") (collectively the "Employer Defendants") and Defendant

Liberty Life Assurance of Boston ("Liberty").[1]  The Employer Defendants have

---

[1] **The Court previously dismissed all claims against Defendant Liberty.  *See* [Dkt. #130, Memo. on Defs.' Mots. to Dismiss, at 25].  It also dismissed Counts III (§ 1983 claim) and IV (wrongful termination claim) against the Employer Defendants as a matter of law.  [*Id.* at 29-30].  Thus, the remaining claims against the Employer Defendants are Counts I (ADA discrimination claim), II (hostile work environment claim arising from disability discrimination), and VI (intentional infliction of emotional distress claim).  [*Id.* at 26-29, 30-32].**

moved for summary judgment.  For the reasons that follow, the motion is GRANTED.

I.    <u>Factual Background</u>

    A.  <u>Fiorillo's Employment at Sikorsky</u>

On or about June 21, 1993, Plaintiff Fiorillo was hired by Defendant Sikorsky, a subsidiary of Defendant UTC.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 1; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 1].[2]  Prior to her employment at Sikorsky, Fiorillo served honorably for twelve years in the United States Air Force.  [Dkt. #123-1, Pl.'s Statement of Disputed Facts at ¶ 2; Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at 22:14-20, 25:24-25].

During her tenure at Sikorsky, Fiorillo's job responsibilities increased, and in or around 1997, Fiorillo transitioned to Defendant Sikorsky's Research & Development department.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 2; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 2].  In this department, Fiorillo served as a contract administrator and was generally responsible for conducting due diligence, researching contract clauses, and handling aspects of contract negotiations.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶¶ 3-4; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶¶ 3-4].  Fiorillo was a contract administrator until she

---

[2] The parties disagree over the relationship between parent entity UTC and subsidiary Sikorsky.  While the Employer Defendants have presented an affidavit attesting to their distinct business units and personnel, *see* [Dkt. #118-20, Ex. 20 to Defs.' Mot., Conant Aff.], Fiorillo offers portions of Defendant Lafferty's deposition, where she testified that she considered herself an employee of UTC and worked in its human resources department.  *See* [Dkt. #123-4, Ex. B to Pl.'s Opp., Lafferty Dep. Tr. at 5:21-6:6].  This dispute of fact is not material because, for the reasons discussed below, Fiorillo has not set forth sufficient facts to support any of her remaining claims against any of the Employer Defendants.

was terminated in November 2011.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 4; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 4].

For several years before her termination, Fiorillo reported to James Robinson ("Robinson"), who, in turn, reported to Defendant David.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶¶ 5, 7; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶¶ 5, 7].  For approximately one year, 2005 through 2006, Fiorillo reported directly to David.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 10; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 10].  During that time, she found working for David to be "[s]tressful, hectic, [and] chaotic" due to the many staff meetings and work demands.  [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at 35:21-36:2].  However, until July 2011, when Fiorillo went on medical leave, she had a good professional relationship with David.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 11; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 11].  Fiorillo voluntarily and comfortably discussed her personal life with David, including her son's disabilities and disorders.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶¶ 12-13; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶¶ 12-13].  These personal interactions lightened the mood of the workplace and helped her establish rapport with David.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 15; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 15].  Fiorillo also discussed with David several sources of personal stress, including workload stress, work environment stress, and stress caused by events at home.  [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at 45:10-20].

With regard to work stress, Fiorillo told David that her group was overworked, and that she and her colleagues were working more than eight-and-a-half to ten hours a day, sometimes up to sixteen hours. [*Id.* at 46:23-47:2].[3] She noted that several colleagues approached David about hiring additional employees, but David did not grant any of their requests. [*Id.* at 192:19-193:8]. Fiorillo also believed that she received the bulk of the contract workload relative to her two colleagues in the Research and Development group. [*Id.* at 178:23-179:3, 180:18-181:11].[4] However, when asked at her deposition, she was unable to recall her colleagues' workloads, or provide other support for her belief. [*Id.* at 182:17-23]. In addition, while Fiorillo did complain to David about the workload, she never told anyone at Sikorsky that she was on the verge of a panic attack, nor did she present him or anyone else at Sikorsky with a note from her doctor advising a reduced workload. [*Id.* at 196:3-13]. She also never told anyone at Sikorsky that she believed she received more work than her colleagues in her group.[5]

---

[3] At her deposition, Fiorillo estimated that in 2011, she worked "[m]ore than 60" hours per week. [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at 198:10-12]. However, she acknowledged that this number was an estimate based on her present-day recollection, and she did not have any documents memorializing her hours at the time. [*Id.* at 199:3-9].

[4] Fiorillo explained that there were three contractors, including her, in the Research and Development Group, and that one of the positions experienced significant turnover during the period in which she claimed she was receiving the bulk of the work. [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at 180:18-181:2]. Sometimes during this period, a male colleague was in the position, whereas at other times, the position was held by a female colleague. [*Id.* at 180:25-181:11].

[5] At most, in October 2011, months after she took her leave, Fiorillo mentioned to Sikorsky employee, Kagdis, that she sought "an evenly distributed workload."

4

Fiorillo further alleges that, when she complained about being overworked, David made facial gestures and tones.  [*Id.* at 91:6-92:14].  He also informed Fiorillo that "everybody's working" as long hours as she was, and that there was "no place else" for the work to go.  [*Id.* at 94:20-23; 193:12-21].  Fiorillo recalled one incident where she spoke with David about her workload by the company's vending machine, and David replied, "we should be thankful that we're busy." [*Id.* at 47:8-10].  After this incident, Fiorillo was apparently cautioned by her direct supervisor, Robinson, not to complain about work levels to David, because Robinson got "chewed out" by David in subsequent meetings.  [*Id.* at 95:2-9]. Fiorillo also contended that David directed certain employees to contact her while she was on vacation.  [*Id.* at 92:14-93:3].  Finally, Fiorillo identified a job opportunity within Sikorsky to which she sought to apply, but which David "squashed" as a result of her disabilities.  [*Id.* at 220:16-25].  Fiorillo claimed that in 2010, she spoke with members of another Sikorsky group, the 53K program, regarding an open position.  [*Id.* at 225:21-25].  The employees said they thought she would fit in well, and would speak with David about the possibility of her joining the program.  [*Id.* at 229:21-230:10].  Sometime thereafter, the posting was removed from Sikorsky's job system, and a few months later, five contract employees were hired to fill the position.  [*Id.* at 230:23-231:1].  One of the employees in the 53K program told Fiorillo that "they took the job down.  And

---

[Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo, Dep. Tr. at 178:11-17].  While Fiorillo went on to explain what she meant by an evenly distributed workload, she does not indicate anywhere that she conveyed this understanding to Kagdis.  [*Id.* at 178:21-182:23].

they're going to hire contractor employees, Deb." [*Id.* at 231:10-18].[6]  While Fiorillo appears to claim that David removed the job position specifically to prevent her from applying, she offers two distinct reasons.  First, she claims he did so because her work hours and schedule did not conform to the job requirements.  [*Id.* at 220:25-221:3].  She elsewhere attributed the decision to her belief that David generally disapproved of her modified work hours accommodation, which she gleaned exclusively from her "years of working at Sikorsky."  [*Id.* at 239:9-25].  Fiorillo never spoke to David about the position.  [*Id.* at 240:14-16].  Fiorillo does not offer any direct evidence tending to show why the position was removed.  She does not allege that she was told by any Defendant or employee of any Defendant why the position was removed.  The only evidence she offers are the facts that the position was taken down before she applied, and months later, it was filled by contract, rather than regular employees.[7]

Relatedly, Fiorillo asserts that David encouraged her to meet with members of the Black Hawk and Naval Hawk groups to discuss a possible transfer to an aircraft sales position, despite knowing that she was not interested in the

---

[6] Fiorillo's testimony regarding her conversation with the 53K employee was inconsistent.  She originally testified that the 53K employee told her that "Ari [David] took the job down," but immediately revised her statement, and testified that he said, "they took the job down.  And they're going to hire contractor employees, Deb."  [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at 231:15-18].  Fiorillo repeated both versions of this conversation later in her deposition.  [*Id.* at 238:7-19].

[7] Elsewhere, Fiorillo contends that she spoke with Robinson, and offered a third theory for why she did not obtain the 53k position, that she "was denied the position because [she] was female."  [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at 283:8-9, 284:6-15].  Nowhere does Fiorillo offer any basis for her belief.

position.  [*Id.* at 226:5-13, 17-25, 227:7-16].  When David approached her about this opportunity, Fiorillo did not tell David she was not interested in the position, nor did she explain how David knew she was not interested, stating only that, "[e]arlier on he knew I loved [Research and Development] . . . . Everything was different all the time.  It was the thrill."  [*Id.* at 227:14-22].  Instead, she told David that she would go talk with members of the other groups, and together, she and they concluded that she would not be a good fit.  [*Id.* at 228:1-12, 229:4-9].  It was only after meeting with the members of the other groups that she informed David she was not interested in joining either one, and she could not recall David's response, if any.  [*Id.* at 229:13-18].[8]

In addition to workload concerns, Fiorillo contends that David and others discriminated against her on the basis of her gender.  [*Id.* at 273:7-11].  Specifically, Fiorillo cites Sikorsky's failure to hire her as a supervisor.  [*Id.* at 244:1-12].  However, Fiorillo never applied for any supervisory positions.  [*Id.* at 244:24-25].  She claims, instead, that in 2006, David talked her out of applying for a supervisory position by stating that the position was not for her, and asking her if she really wanted to attend all of the necessary meetings and would be willing

---

[8] Fiorillo testified about another job to which she unsuccessfully applied, in UTC's Research Center (the "UTRC"). [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at 234:7-10].  Fiorillo interviewed with the individual she was replacing, but ultimately was not selected for the position.  [*Id.* at 235:11-14].  She did not know who else applied or whether anyone was hired for the position, but believes that David became aware of her application through her direct supervisor, Robinson, whom she told about it.  [*Id.* at 235:2-7, 20-25].  However, Fiorillo never told David about the application.  [*Id.* at 235:18-22].  In addition, she did not believe that David prevented her from obtaining the position, nor did she believe that she lost out on it due to her disabilities.  [*Id.* at 236:21-237:9].  Indeed, while she believed that her failure to obtain the 53K position was "because of my disabilities[,] . . . [t]he UTRC, I don't know what happened there."  [*Id.* at 237:7-9].

to be on call throughout nights when necessary.  [*Id.* at 245:25-246:9].  Fiorillo claims that David's statement was motivated by her gender, because at that time, there were no female managers in her group.  [*Id.* at 268:7-14].  However, she equivocated on this point when she was asked about two female employees, one of whom she "believed" was an executive, and another whom she described as vice-president of her group, stating that she "owned all of us."  [*Id.* at 268:17-269:7].

Fiorillo also contended that David talked down to her and other women in meetings, by displaying an attitude that he did not take them seriously, and that their opinions did not matter.  [*Id.* at 274:12-21, 276:9-19].  As evidence, she cited David's reliance on the opinions of other male employees as a means of verifying her conclusions.  [*Id.* at 278:13-18].  Finally, Fiorillo asserted that she had not been promoted since 1997 because of her gender.  [*Id.* at 284:17-285:1].  However, Fiorillo did not identify any basis for this belief.

Fiorillo claims that several Sikorsky employees, in addition to David, through the conduct described above, created a hostile work environment.  First, she maintains that Defendant Lafferty harassed her by allegedly disclosing private information Fiorillo transmitted to her.  [*Id.* at 279:20-280:5].  Fiorillo claims she sent Lafferty documents containing personal information, and the documents were somehow returned to her with a fax line which stated, "new engineering building third floor."  [*Id.* at 279:20-280:1].  Fiorillo could not recall any other details regarding this alleged harassment, nor does she allege that the

fax showed that an unintended recipient saw the confidential information.  [*Id.* at 280:15-19].[9]

As for Defendants Morris and Meisner, Fiorillo could not recall anything they did to create a hostile work environment.  [*Id.* at 280:20-281:15].  Indeed, Fiorillo could not recall any communications she had with either Morris or Meisner, aside from exchanging pleasantries.  [*Id.* at 286:16-288:3].  Instead, Fiorillo cites generally to Sikorsky's job post system and her experience as a female in its contracts and counsel group, which together, fostered a hostile work environment.  [*Id.* at 280:23-281:2].

B. <u>Fiorillo's Prior Accommodations from Sikorsky</u>

During her time at Sikorsky, Fiorillo sought and received multiple accommodations and leaves of absence in light of a series of medical problems. [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 16; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 16].  First, in 1995, Fiorillo took approximately 90 to 120 days off to recover from depression, anxiety, and a panic disorder.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶¶ 17-18; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶¶ 17-18].  According to Fiorillo, Defendant Sikorsky had "no problem" with her taking that time.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 19; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 19].  Then, in 2001, Fiorillo took a brief leave of absence to treat chest pains and anxiety.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 20; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 20].  Several years later, in 2008,

---

[9] Fiorillo's testimony appears to imply that Lafferty gave the documents to some other Sikorsky employee, who faxed them back to Fiorillo, thereby disclosing the information she intended for Lafferty's eyes only.  However, Fiorillo offers no facts to support her theory, in particular, she provides no evidence that anyone other than Lafferty saw or sent her the documents.

Fiorillo underwent shoulder surgery and took medical leave.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 21; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 21]. According to Fiorillo, Defendant David had no problem with her leave of absence or additional time she took to undergo physical therapy.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 22; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 22].  In addition, Fiorillo requested, and Sikorsky provided, a special parking spot to accommodate some of her physical issues.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 23; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 23].  Also, in 2010, Fiorillo sought and received a work-at-home accommodation, allowing her to work remotely from home two days a week in order to care for her son.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶¶ 24-27; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶¶ 24-27].  Both of Fiorillo's supervisors, Robinson and David, understood the reason for the accommodation, had no problem with it, and approved it.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶¶ 24, 28-29; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶¶ 24, 28-29].  Finally, at some point, Fiorillo received a work hours accommodation, permitting her to work from 6:30 AM to 3:00 PM.  [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at 240:1-5].  At the time of her departure, Sikorsky was providing Fiorillo with the special parking spot closer to her work area, the work-at-home accommodation permitting her to work remotely from her home twice a week, and the work hours accommodation, which, collectively, enabled her to perform her job duties through mid-July 2011, when she suffered a nervous breakdown. *See* [Dkt. #119, Defs.' Rule 56(a)(1)

Statement at ¶¶ 23-27; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶¶ 23-27; Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at 240:1-5].

    C.  **Fiorillo's Departure From Sikorsky and Termination**

    During the first half of 2011, Fiorillo felt that the amount of work in her department had increased, causing her to feel overworked.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶¶ 31-32; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶¶ 31-32].  In early 2011, Fiorillo's supervisor, Robinson, approached Defendant David to request an additional employee, after receiving encouragement to do so from a consensus of his direct reports.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶¶ 33-34; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶¶ 33-34].  David took up the request with his supervisor, but the supervisor did not approve it.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶¶ 35-36; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶¶ 35-36].  The reason his supervisor gave was that the company's budgets and resources were "tight" and the company "did not have the resources to add an additional person to the research and development group." [Dkt. #123-1, Pl.'s Statement of Disputed Facts at ¶ 77; Dkt. #123-4, Ex. C to Pl.'s Opp., David Dep. Tr. at 53:6-7, 14-19].

    In mid-July 2011, Fiorillo took time off work.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 38; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 38].  During this time away, Fiorillo claims she suffered a nervous breakdown.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 39; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 39]. On July 25, 2011, Fiorillo obtained a note from her physician, Dr. Antonio Scappaticci, which stated that "[r]estrictions should apply from [July 25, 2011]

until [August 1, 2011]," but that she "may return to work" on August 1, 2011. [Dkt. #118-5, Ex. 5 to Defs.' Mot. at 2]. Fiorillo contends that she later received and sent to Defendant Sikorsky a second note from Dr. Scappaticci extending the recommended leave of absence. [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 41; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 41]. This note was not included in the record before the Court, and there is no indication that it contained a new return to work date.

In August 2011, Fiorillo called Defendant Lafferty, a human resources client manager at Defendant Sikorsky, to inform her that she was out sick. [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 42; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 42]. Lafferty told Fiorillo that she needed to file for short-term disability benefits and that her benefits provider, Liberty, had not received the required paperwork from her doctors. [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶¶ 44-45; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶¶ 44-45].

On August 16, 2011, Fiorillo called Defendant David to discuss her absence. [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 45; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 45]. During this conversation, David asked her if she was cleared to return to work and Fiorillo told him that she was not. [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 46; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 46]. After that, Fiorillo contends that David yelled, "what is going on" at her, and stated that he was unsure what he was going to do with her job. [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶¶ 47-48; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶¶ 47-48; Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at 82:17-23]. Fiorillo does

not allege that David raised his voice at her again during this conversation, or at any other time.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 48; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 48].   David also told Fiorillo that the fact that her doctors were submitting paperwork in support of her short-term disability claim did not mean that the claim would be approved by the third-party independent benefits administrator.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 49; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 49].  Following this call, Fiorillo contends that she was afraid to return to work because she thought David would judge her negatively as a result of her depression, and he did not believe that she was actually ill.  *See* [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at 82:9-16, 84:16-23].  Fiorillo further testified that David's reaction reminded her of being dismissed by her stepfather as whining, complaining.  [*Id.* at 88:16-20].[10]

On September 13, 2011, Defendant Lafferty wrote Fiorillo a letter requesting that Fiorillo "provide a return to work date as soon as possible or otherwise advise as to the status of [her] absence."  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 51; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 51; Dkt. #118-6, Ex. 6 to Defs.' Mot. at 2].  The letter also stated that Fiorillo had "not reported to work since July 23, 2011" and had "not provided any return to work date."  [Dkt. #118-6, Ex. 6 to Defs.' Mot. at 2].  By this point, Fiorillo had been away from work for more than one-and-a-half months.

---

[10] Sometime after this call, in September 2011, Fiorillo testified that she exchanged emails with David, in which David inquired about her return date and Fiorillo explained that her doctors had not yet cleared her to return.  In response, David asked her who approved the sick days she had taken, and Fiorillo never responded to his question.  [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at 70:5-20, 202:20-203:3].  These emails are not in the record before the Court.

On September 28, 2011, just over two weeks after she sent her first letter to Fiorillo, Defendant Lafferty sent a second letter.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 53; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 53].  The letter began by stating that the company's disability carrier had denied her claim for benefits.  [Dkt. #118-7, Ex. 7 to Defs.' Mot. at 2].  The letter further stated:

> Please let us know when you intend to return to work.  If you require an accommodation to facilitate your return, or if you plan to apply for FMLA leave, please let us know and provide supporting medical documentation so we may evaluate your request.  If you do not do so and you fail to return to work by October 10, 2011 then you will be removed from company payroll and we will consider you to have resigned your employment.

[*Id.*].

After receiving this letter, Fiorillo again called Defendant Lafferty.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 55; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 55].  Fiorillo told Lafferty she was not cleared to return to work, was appealing the disability insurance carrier's denial of her short-term disability benefits, and had not resigned her position.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 56; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 56; Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at 107:9-12].

Later that month, Defendant Sikorsky received Fiorillo's FMLA paperwork, in which she requested a leave for "undetermined days, from [July 23, 2011] through undetermined."  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 57; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 57; Dkt. #118-10, Ex. 10 to Defs.' Mot. at 2].  The accompanying health care provider form was prepared by Dr. Robert Salinger, a licensed marriage and family therapist, on October 3, 2011.  [Dkt. #118-

10, Ex. 10 to Defs.' Mot. at SIK0227].  The form stated that Dr. Salinger had been counseling Fiorillo since May 12, 2011, and since that time, he had been providing Fiorillo individual therapy sessions twice a week, for 50 minutes.  [*Id*. at SIK0225].  Dr. Salinger opined that Fiorillo was suffering from post-traumatic stress disorder ("PTSD"), that increasing job pressures triggered the onset of severe symptoms, and as a result, she was unable to perform simple tasks without being flooded by anxiety.  [*Id*.].  Dr. Salinger stated that Fiorillo was unable to work at all, and could not offer any return date.  [*Id*. at SIK0225-26].  He wrote that Fiorillo told him that "over a period of time, she had asked her supervisor [at Sikorsky] for help because she felt overwhelmed with the work load" but "[h]er requests were dismissed as unimportant, and she was informed that everyone was under stress."  [*Id*. at SIK0226-27].  Finally, according to Salinger, after leaving the company on July 23, the "problems she [was] having with both work and the disability insurance company" caused Fiorillo's PTSD symptoms to worsen.  [*Id*. at SIK0227].

On October 28, 2011, Defendant Lafferty sent Fiorillo a third letter.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 58; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 58; Dkt. #118-11, Ex. 11 to Defs.' Mot. at 2].  The letter informed Fiorillo that her FMLA leave request had been approved, and would expire on November 12, 2011.  [Dkt. #118-11, Ex. 11 to Defs.' Mot. at 2].  The letter then asked Fiorillo if she "intend[ed] to return to work in advance of November 12" and informed her that if she did not return to work by November 14, 2011, her employment would be terminated.  [*Id*.].  Fiorillo never provided Lafferty with an

approximate return to work date.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 59; Dkt. #123-1, Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 59].  However, Fiorillo did contact Lafferty and reiterated that her doctors had not cleared her to return to work and she was not resigning her position.  [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at 113:16-114:4].

In addition to Lafferty, in October 2011, Carol Kagdis ("Kagdis"), an employee in Sikorsky's medical department, contacted Fiorillo regarding her return to work and need for a reasonable accommodation.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 60; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 60]. Fiorillo informed her that she did not know when she would be returning.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 61; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 61].

During this conversation, Ms. Kagdis asked Fiorillo about any accommodations she might need in order to return.  [Dkt. #118-2. Ex. 2 to Defs.' Mot., Fiorillo Dep. Tr. at 103:13-16].  With regard to completing her therapy and adjusting her medications, Fiorillo informed Kagdis that she would need an undetermined amount of time.  *See* [*id.* at 105:1-3, 174:7-10].[11]  Specifically, Fiorillo informed her that she "would need more people" and the time "to finish [her] therapy, and  . . . to adjust [her] medications."  [*Id.* at 103:16-18].  By "more

---

[11] Fiorillo claims that she expected the Defendants to keep her job open for six months, as they had back in 1995.  *See* [Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 64 (citing Dkt. #118-2. Ex. 2 to Defs.' Mot., Fiorillo Dep. Tr. at 207:9-13)].  However, Fiorillo testified that in 1995, she was out of work only "[90] to 120 days," and admitted that she never expressed this expectation to any of the Defendants.  [Dkt. #118-2. Ex. 2 to Defs.' Mot., Fiorillo Dep. Tr. at 52:10-14, 207:19-22].

people," Fiorillo meant more people to help her with her job responsibilities, so that the work environment would feel less stressful to her.  [*Id.* at 105:11-21; Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 63; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 63].  Hand-in-hand with her request for "more team people to help with the work load" were "an evenly distributed work load and a less stressful work environment."  [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo, Dep. Tr. at 178:11-17].  Fiorillo also told Kagdis that she would contact her after her doctor's appointment, but she never did.  [*Id.* at 183:10-25].

Aside from this conversation initiated by Ms. Kagdis, Fiorillo had no discussions with anyone at Sikorsky regarding accommodations which would enable her to return to work, nor did she ever provide an estimated return date. [*Id.* at 104:14-18].  While on leave, Fiorillo did ask Lafferty to hire additional people, but she did not indicate that this request was a request for a reasonable accommodation.  *See* [Dkt. #123-4, Ex. B to Pl.'s Opp., Lafferty Dep. Tr. at 45:10-20 52:7-11.[12]  Aside for these two conversations, Fiorillo did not initiate or otherwise have any discussions with Sikorsky about reasonable accommodations, and she has not identified any other accommodations which, if implemented, would have allowed her to perform her essential job functions at any time after July 2011.  Moreover, in early October 2011, Sikorsky knew that no reasonable accommodation would enable Fiorillo to return to work, because on

---

[12] Sometime after this conversation, Lafferty spoke with David about hiring another person, but David told her that he felt Fiorillo's job could be handled by one person.  [*Id.* at 46:5-11].  Just months earlier, David had spoken with his supervisor about hiring more people in Fiorillo's group, but his supervisor said that the budget would not allow it.  [Dkt. #123-1, Pl.'s Statement of Disputed Facts at ¶ 77; Dkt. #123-4, Ex. C to Pl.'s Opp., David Dep. Tr. at 53:6-7, 14-19].

October 3, 2011, Fiorillo's licensed therapist, Dr. Robert Salinger, completed a form in which he opined unequivocally that Fiorillo was unable to perform any work.  [Dkt. #118-10, Ex. 10 to Defs.' Mot. at SIK0225-26].

Fiorillo contends that the letters she received from and the telephone conversations she had with employees of Sikorsky during her leave constituted harassment and set back her recovery from her panic attack.  [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo, Dep. Tr. at 173:8-174:5, 206:3-6, 242:14-25].  However, she does not claim that she or her physicians ever informed anyone at Sikorsky that they should not contact her.  In addition, when asked why she found these letters and phone calls harassing, Fiorillo stated that, in addition to the call in which David yelled at her, which itself was harassing, she considered the number of communications and her doctors' failure to timely provide documentation to both Liberty, the disability insurance carrier, and Sikorsky to constitute harassment. [*Id.* at 202:8-12, 203:4-8, 20-25, 204:23-206:12].

Fiorillo was placed on FMLA leave, and on November 14, 2011, upon the expiration of her leave, and while Dr. Salinger's letter opining that Fiorillo was unable to perform any work remained extant, Sikorsky terminated her employment.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 69; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 69].

D.  Fiorillo's Social Security Disability Benefits Application

Following her termination, Fiorillo applied for Social Security disability benefits.  On November 26, 2013, she testified before an ALJ at a hearing in support of her application.  *See* [Dkt. #118-15, Ex. 15 to Defs.' Mot.].  At the

hearing, Fiorillo testified that she stopped working at Sikorsky in July 2011 following a nervous breakdown, she tried to look for work in a non-stressful environment, she was unable to hold any sort of job because she was unable to sit or stand for long periods of time, she was easily confused, she required significant amounts of counseling, and suffered from several hand and elbow ailments. *See* [*id*. at 3-4]. Her physical ailments limited her ability to type and necessitated frequent and prolonged breaks. [*Id*. at 3].

On December 10, 2013, the ALJ issued his decision and found that Fiorillo had been disabled since July 19, 2011. [Dkt. #118-13, Ex. 13 to Def's Mot. at 8]. In reaching this decision, he noted that Fiorillo contended she was "unable to work in any capacity due to a combination of symptoms caused by her multiple physical and mental impairments." [*Id*. at 11]. After reviewing the medical evidence and her testimony, the ALJ found that her physical and mental symptoms "would cause her to be off task to a degree that would not allow her to perform even simple work activities on a sustained basis." [*Id*.]. This finding is consistent with the opinion rendered by Dr. Salinger to Sikorsky, which had not been superseded as of the date Fiorillo's FMLA expired and her employment was terminated.

II.    Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse,* 611 F.3d 98,

106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).  In addition, determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment, as such are within the sole province of the jury.  *Hayes v. New York City Dep't of Corr.,* 84 F. 3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch–Rubin v. Sandals Corp.,* No. 3:03-cv-481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, 817 F. Supp. 2d 28, 37 (D. Conn 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of

proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712, 727 (2d Cir. 2010).

III.   <u>Analysis</u>

   A.   <u>Defendants UTC and Sikorsky are Entitled to Summary Judgment on Count I of the Complaint Because Fiorillo Fails to Set Forth a *Prima Facie* Showing of a Failure to Accommodate</u>

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to . . . discharge of employees."  42 U.S.C. § 12112(a). Claims alleging disability discrimination are assessed under the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this scheme, "[a] plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext."  *Id.*

"The statute defines 'discriminate' to include 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'"  *Felix v. N.Y. City Transit Auth.*, 324 F.3d 102, 104 (2d Cir. 2003) (quoting 42 U.S.C. § 12112(b)(5)(A)).  In addition, a "qualified individual" under the ADA is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).

To set forth a *prima facie* case of disability discrimination through a failure to accommodate, it must be shown that:

> (1) [P]laintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of h[er] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations

*McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 97 (2d Cir. 2009) (citations and quotations omitted).

For the purposes of this motion, the Defendants do not contest the first two elements of Fiorillo's *prima facie* showing. *See* [Dkt. #118, Defs.' Memo. at 13 n. 10]. Accordingly, the issues before the Court on this motion are (i) whether Plaintiff Fiorillo could have performed the essential functions of her job with a reasonable accommodation and (ii) whether UTC and Sikorsky refused to make such accommodations. As explained below, the answer to both of those questions is no.

### 1. <u>Fiorillo Was Not Able to Perform the Essential Functions of Her Job.</u>

The Second Circuit has held that the plaintiff bears the burden of production and persuasion on the issue of whether she can perform the essential functions of the job in question, with or without reasonable accommodation. *Borkowski v. Valley Cent. School Dist.*, 63 F.3d 131, 137–38 (2d Cir.1995) ("A plaintiff cannot be considered 'otherwise qualified' unless she is able, with or without assistance, to perform the essential functions of the job in question. It follows that the plaintiff bears the burden of proving either that she can meet the requirements of the job without assistance, or that an accommodation exists that

permits her to perform the job's essential functions.").  First, on October 3, 2011, Dr. Salinger unequivocally opined that Fiorillo was unable to perform any work. He did not withdraw, qualify or otherwise change that opinion at any time prior to her termination.  [Dkt. #118-10, Ex. 10 to Defs.' Mot. at SIK0225-26].  Indeed, nowhere in his opinion does Dr. Salinger suggest that either of the accommodations Fiorillo proposed would have permitted her to perform her job's essential functions.  Thus, Fiorillo had informed Sikorsky that she was unable to perform her job with or without accommodations on the date of her termination.

Second, Fiorillo has not offered any evidence that as of the date of her termination, she was able to perform her essential job functions even with her proposed accommodations.  Instead, the record from July through November 2011 contains repeated phone calls in which Fiorillo informed Sikorsky that she remained unable to return to work, that she had not been cleared by her doctors, and that she would need an indeterminate amount of time to undergo therapy and adjust her medications.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶¶ 42, 44-46, 55-56; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶¶ 42, 44-46, 55-56; Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at 113:16-114:4].  These findings are wholly consistent with that reached by the ALJ who considered Fiorillo's application for disability benefits and found that Fiorillo had been disabled since July 19, 2011. [Dkt. #118-13, Ex. 13 to Def's Mot. at 8].

### 2.   Fiorillo's Request for An Undetermined Leave Of Absence Was Not A Reasonable Accommodation.

As for assessing a proposed reasonable accommodation, the Second Circuit has fastened a two-step test: "First, the plaintiff bears the burden of

proving . . . that an accommodation exists that permits her to perform the job's essential functions . . . . If the plaintiff meets that burden, the analysis shifts to the question [of] whether the proposed accommodation is reasonable; on this [second] question the burden of persuasion lies with the defendant." *Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000) (citations and quotations omitted). Under the first part of this test, a plaintiff discharges its burden by "identifying an accommodation, the costs of which, facially, do not exceed its benefits." *Tillman v. Verizon New York, Inc.*, ---F. Supp. 3d ----, 2015 WL 4603372, at *21 (E.D.N.Y. Jul. 30, 2015) (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 139 (2d Cir. 1995)). Reasonable accommodations may include "modification of job duties and schedules, alteration of the facilities in which a job is performed, acquisition of devices to assist the performance of job duties, and, under certain circumstances, reassignment to a vacant position." *McBride*, 583 F.3d at 97 (citations and quotations omitted).

Fiorillo sought an indeterminate leave of absence. "The duty to make reasonable accommodations does not, of course, require an employer to hold an injured employee's position open indefinitely while the employee attempts to recover, nor does it force an employer to investigate every aspect of an employee's condition before terminating him based on his inability to work." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 338 (2d Cir. 2000). The duty to adopt reasonable accommodations also "'does not require a lowering of standards . . . nor that the employer make fundamental or substantial modifications in order to eliminate the disadvantages flowing from the

disability.'"  *Gialanza v. Time Warner Cable*, No. 07-cv-6050, 2009 WL 857502, at *9 (W.D.N.Y. Mar. 30, 2009) (quoting *Fink v. New York City Dep't of Personnel*, 53 F.3d 565, 567 (2d Cir. 1995)) (dismissing failure to accommodate claim under ADA)).

After leaving work at the end of July, in August 2011, Fiorillo had two separate phone conversations with Defendants Lafferty and David regarding her absence, and at no time during these calls did she provide a return to work date. [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶¶ 42, 44-49; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶¶ 42, 44-49].  On September 13, 2011, Defendant Lafferty wrote Fiorillo a letter requesting that Fiorillo "provide a return to work date as soon as possible or otherwise advise as the status of [her] absence."  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 51; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 51; Dkt. #118-6, Ex. 6 to Defs.' Mot. at 2].  The letter also stated that Fiorillo had "not reported to work since July 23, 2011" and had "not provided any return to work date."  [Dkt. #118-6, Ex. 6 to Defs.' Mot. at 2].  By this point, Fiorillo had been away from work for more than one-and-a-half months.  Fiorillo did not respond to this letter.

On September 28, 2011, Lafferty sent a second letter, in which she asked Fiorillo to identify any reasonable accommodation she would need to return to work and warned of the consequences of her continued silence:

> *Please let us know when you intend to return to work*.  If you require an accommodation to facilitate your return, or if you plan to apply for FMLA leave, please let us know and provide supporting medical documentation so we may evaluate your request.  *If you do not do so and you fail to return to work by October 10, 2011 then you will be*

> ***removed from company payroll and we will consider you to have
> resigned your employment.***

   [Dkt. #118-7, Ex. 7 to Defs.' Mot. at 2 (emphasis added)].

Fiorillo was thus on notice of both the Defendants' requests for a return
date and that her failure to provide one or to return by October 10, 2011 would
result in her removal from the payroll.  After receiving this letter, Fiorillo once
again called Defendant Lafferty, and again, despite receiving multiple written
requests, she did not inform Lafferty of her return date, stating only that she was
not cleared to return to work.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 56;
Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 56; Dkt. #123-3, Ex. A to Pl.'s Opp.,
Fiorillo Dep. Tr. at 107:9-12].  Indeed, even the FMLA paperwork Fiorillo submitted
requested leave for "undetermined days, from [July 23, 2011] through
undetermined."  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 57; Dkt. #123-1,
Pl.'s Rule 56(a)(2) Statement at ¶ 57; Dkt. #118-10, Ex. 10 to Defs.' Mot. at
SIK0222].  Finally, Defendant Lafferty sent Fiorillo a third letter, stating that her
FMLA leave would expire on November 12, 2011, asking if she "intend[ed] to
return to work in advance of November 12" and informing her that if she did not,
her employment would be terminated.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement
at ¶ 58; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 58; Dkt. #118-11, Ex. 11 to
Defs.' Mot. at 2].

Fiorillo responds by stating, inexplicably, that she had expected to have up
to six months to recover, like she did back in 1995, she was denied the use of
sick time she had accrued during her employment, she was consulting with
doctors who were unable to provide her with a return date, and her post-leave

telephone calls with David, Lafferty, and Kagdis, and the letters she received from Lafferty, set back her recovery and left her scared to return to work.  *See* [Dkt. #123, Pl.'s Opp. at 15, 18; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶¶ 56, 64; Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 56; Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo, Dep. Tr. at 82:9-16, 84:16-23, 173:8-174:5, 206:3-6, 242:14-25].  None of these arguments succeed, since they do not indicate that Fiorillo provided the Defendants with a "request[] for a finite amount of extended leave time."  *Vangas v. Montefiore Med. Ctr.*, 6 F. Supp. 3d 400, 413 (S.D.N.Y. 2014).

As for her expectation that she would be given six months to recover, Fiorillo never raised this belief with anyone at UTC or Sikorsky.  *See* [Dkt. #118-2, Ex. 2 to Defs.' Mot., Fiorillo Dep. Tr. at 207:19-22].  Moreover, she repeatedly testified that she was out of work for up to 120 days, or four months, in 1995.  [*Id.* at 52:10-14, 207:9-13].[13]  Given that she left Sikorsky in mid-July and was terminated on November 14, 2011, she received approximately the same amount of time to recover as she did in 1995.

Similarly, Fiorillo did not tell the Employer Defendants that she expected to use her accrued sick days to extend her employment beyond the end date provided by Sikorsky.  As Fiorillo testified, the decision whether or not to permit

---

[13] Fiorillo once referred to the period of time she was out in 1995 as constituting six months, but quickly revised it to the 120 days she otherwise testified as constituting the high end of the range of days she was out of work during that time.  *See* [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo, Dep. Tr. at 207:9-13].  Otherwise, Fiorillo claims she was out of work for six months in 2009, when she was recovering from rotator cuff surgery.  [*Id.* at 51:15-24].  Given the fundamentally different nature of the injuries from which she was recovering in 2009, any expectation that she would receive the same amount of time off for her condition in 2011, without any discussion with her employer, was unreasonable.

her to use these days rested with Defendant Liberty, not the Employer Defendants, and Fiorillo informed her employer that Defendant Liberty did not agree that she could do so.  [*Id.* at 52:20-22, 115:5-23].  Indeed, the only communication Fiorillo could recall with anyone at Sikorsky regarding her use of sick days to extend her return date was the September 28, 2011 letter she received from Defendant Lafferty, which merely stated that Liberty had denied her claim for short-term disability benefits.  *See* [Dkt. #118-7, Ex. 7 to Defs.' Mot. at 2; Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at 207:23-208:24].  Moreover, that the Employer Defendants did not independently decide to hold her position open until the running of all of her accrued sick days does not constitute a denial of a reasonable accommodation, since Fiorillo gave the Defendants "no suggestion that [she] might ever be able to return to work." *Gallagher v. Town of Fairfield*, No. 3:10-cv-1270 (JAM), 2015 WL 3453342, at *10 (D. Conn. May 29, 2015) (granting summary judgment to defendants and rejecting plaintiff's assertion that defendants should have held her position open "at least for the duration of her accrued sick leave").

Next, Fiorillo's repeated statements to the Employer Defendants that her doctors were still determining when she could return are not sufficient to render her requested accommodation reasonable because these statements merely indicated "that she was not able to return to work on her scheduled return date, and did not indicate how long of an extension of leave she would require." *Vangas*, 6 F. Supp. 3d at 413 (concluding that "requests for more time to follow

up with doctors" absent a finite return date "may only fairly be characterized as requests for indefinite leave").[14]

Finally, Fiorillo's reliance on the post-leave communications she had with the Defendants is misplaced.  Even if these communications interfered with her treatment efforts and made her afraid to return to work, this is not sufficient to transform an otherwise unreasonable accommodation—an indefinite period of leave—into a reasonable one.  As to the letters she received from the Employer Defendants requesting that she provide them with a return to work date and identify any necessary accommodations, Fiorillo never offered a return date, and even if she had requested that the Defendants cease contacting her—which she did not—such a request ultimately amounts to one for an indefinite period of both non-contact and leave.  Moreover, to the extent that Defendant David's phone call caused Fiorillo to fear returning to work, it would seem that no amount of leave would be sufficient to accommodate her, since she would still be working for David upon her return.

As Fiorillo has not set forth any evidence showing that the amount of time away from work she sought was anything other than an indefinite period of leave,

---

[14] The Court notes that nearly a month after Fiorillo was terminated, one of her doctors, Dr. Scappaticci, determined that she was able to work full or part-time, but only in a non-stressful environment.  *See* [Dkt. #118-12, Ex. 12 to Defs.' Mot. at 2].  Fiorillo never provided the Defendants with this note, nor is there any indication that the doctor reached this conclusion prior to her termination date. *See* [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo, Dep. Tr. at 131:8-18].  In addition, as the Employer Defendants point out, even if Fiorillo had submitted the note prior to her termination and requested a non-stressful work environment, such an accommodation would not be reasonable under the ADA.  *See Potter v. Xerox Corp.*, 88 F. Supp. 2d 109, 114 (W.D.N.Y. 2000) (noting that no employer is obligated to provide an employee "with a completely stress-free environment").

her requested accommodation was not reasonable.  *See Mitchell v. Washingtonville Cent. School Dist.*, 190 F.3d 1, 9 (2d Cir. 1999) ("The ADA does not require an employer to accommodate an employee who suffers a prolonged illness by allowing him an indefinite leave of absence.").

> **3.**   **Fiorillo's Request That Sikorsky Hire More Staff And Reassign Some Of Her Job Functions To Other Employees Was Not a Reasonable Accommodation**

The second accommodation Fiorillo requested, that Sikorsky hire or assign more employees to help with her job, was also unreasonable.

A "[r]easonable accommodation does not mean elimination of any of the job's essential functions."  *Shannon v. New York City Transit Auth.*, 332 F.3d 95, 104 (2d Cir. 2003) (quoting *Gilbert v. Frank*, 949 F.2d 637, 642 (2d Cir. 1991)). Courts across the country and in this Circuit have held that, while restructuring an existing job may be a reasonable accommodation, an employer is not obligated to hire additional employees or have multiple employees perform the work normally performed by a single employee in order to satisfy its obligations under the ADA.  *See Stevens v. Rite Aid Corp.*, No. 6:13-cv-783, 2015 WL 5602949, at *13 (N.D.N.Y. Sept. 23, 2015) (finding that a request that the company hire a nurse to perform immunizations for the plaintiff "does not constitute a reasonable accommodation within the meaning of the ADA") (citing cases); *Hunt-Watts v. Nassau Health Care Corp.*, 43 F. Supp. 3d 119, 134 (E.D.N.Y. 2014) (holding plaintiff "fail[ed] to establish a *prima facie* case that a reasonable accommodation exists" where she asserted that she could perform her essential job functions if the company provided her with a nurse to assist in performing her duties or had

other podiatrists perform operations and surgeries because her request "amount[ed] to having other employees do her job for her, and would result in Defendant having to employ two professionals to perform the job of one podiatrist").  This is, in part, because "[a]n employer . . . is not required to reallocate essential functions" of an employee's job.  29 C.F.R. Pt 1630, App. 1630.2(o); *see also Desmond v. Yale-New Haven Hosp., Inc.*, 738 F. Supp. 2d 331, 348 (D. Conn. 2010).

In addition, the record indicates that Fiorillo was far from the only employee to have suggested that management hire more people.  In early 2011, just a few months before Fiorillo went out on leave, Robinson approached Defendant David to request an additional employee, in response to numerous requests from other Sikorsky employees.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶¶ 33-34; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶¶ 33-34]. David took up the request with his supervisor, and David's supervisor declined to hire additional employees, citing a "tight" budget which did not permit for hiring "an additional person to the research and development group."  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶¶ 35-36; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶¶ 35-36; Dkt. #123-1, Pl.'s Statement of Disputed Facts at ¶ 77; Dkt. #123-4, Ex. C to Pl.'s Opp., David Dep. Tr. at 53:6-7, 14-19].  Thus, by the time Fiorillo requested this accommodation in the fall of 2011, the Defendants had already considered it and determined that it was financially infeasible, and Fiorillo offers no facts to refute this determination.  Under these circumstances, Sikorsky has established that hiring additional employees would have posed an undue hardship.  *See, e.g.,*

31

*Daniels v. Murphy*, No. 3:11-cv-00286 (SRU), 2014 WL 3547235, at *11 (D. Conn. Jul. 17, 2014) (finding plaintiff's request for an orthotic imposed an undue hardship in light of the factors articulated in 42 U.S.C. § 12111(10) and where plaintiff failed to offer "any argument or evidence" to rebut the defendants' claim).

Even if Fiorillo's proposed accommodation could be construed as seeking that some of her workload be taken up by other Sikorsky employees, her request remains unreasonable. *See Stevens*, 2015 WL 5602949, at *13 ("[R]educing workload is not a reasonable accommodation.") (citing and quoting *Floyd v. Lee*, 85 F. Supp. 3d 482, 510 (D.D.C. 2015)); *see also Lowry v. Eastman Kodak Co.*, 14 F. App'x 27, 30 (2d Cir. Jun. 13, 2001) (finding plaintiff failed to satisfy the third prong of *prima facie* case where he sought employment in a position "with a reduced workload"). Nowhere does Fiorillo limit her work reassignment request to nonessential aspects of her job. She simply asks that a portion of the work assigned to her be reassigned to her already overworked colleagues. *See, e.g.*, *EEOC v. Amego, Inc.*, 110 F.3d 135, 148 (1st Cir. 1997) (affirming holding of district court that it was an undue hardship for an employer to relieve an employee of job duties the employee was unable to perform due to a disability where the employer had no one else to perform them).

Relatedly, Fiorillo never told anyone at Sikorsky that she believed her workload was uneven relative to her colleagues. At most, she mentioned "an evenly distributed work load" as one of several accommodations she would need in order to return, in conjunction with "more team people to help with the work

load" *and* a "less stressful work load environment."  [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo, Dep. Tr. at 178:11-17].  As noted above, the record shows that Fiorillo's coworkers were chafing under their own workload.  Moreover, since in addition to an evenly distributed workload Fiorillo requested additional, unreasonable, accommodations and stated that she would need all of them in order to return and perform her essential job functions, any failure to consider redistributing some of Fiorillo's work does not constitute the denial of a reasonable accommodation.  *See Thorner-Green v. New York City Dep't of Corrs.*, 207 F. Supp. 2d 11, 14 (E.D.N.Y. 2002) (granting summary judgment to defendant where plaintiff received accommodation she requested and evidence "demonstrates that plaintiff could not perform the essential functions of her job, even with reasonable accommodation"); *Turowski v. Triarc Cos., Inc.*, 761 F. Supp. 2d 107, 113 (S.D.N.Y. 2011) (granting defendants' motions for summary judgment after finding "[d]efendants provided reasonable accommodations to [plaintiff]" and "that no reasonable juror could find that [plaintiff] could perform the essential functions of his positions with or without accommodation").

Here, Sikorsky had reasonably accommodated Fiorillo's disability by giving her a special parking spot close to her work area, allowing her to work at home twice a week, and changing her work hours, yet Fiorillo was unable to perform her job duties beginning in mid-July 2011 and continuing through the date of her termination.  Sikorsky has established that Fiorillo's request for reassignment of her duties to other employees was not reasonable.

**4.    Fiorillo's Charge That Sikorsky Did Not Engage in the Interactive Process To Identify A Reasonable Accommodation Is Belied By the Evidence.**

Finally, Fiorillo contends that UTC and Sikorsky failed to participate in the mandatory "interactive process" governing reasonable accommodations.  [Dkt. #123. Pl.'s Opp. at 15].  This is simply not true.  "The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated."  *Jackan*, 205 F.3d at 566.  "To satisfy its ADA obligations in this regard, an employer must first identify the full range of alternative positions for which the individual satisfies the employer's legitimate, nondiscriminatory prerequisites, and then determine whether the employee's own knowledge, skills, and abilities would enable her to perform essential functions of those alternative positions, with or without reasonable accommodation."  *Felix v. New York City Transit Auth.*, 154 F. Supp. 2d at 640, 658 (S.D.N.Y. 2001), *aff'd*, 324 F.3d 102 (2d Cir. 2003) (citations and quotations omitted).  However, "the ADA imposes liability for . . . discriminatory refusal to undertake a *feasible accommodation*, not mere refusal to explore possible accommodations where, in the end, no accommodation was possible."  *McBride*, 583 F.3d at 100 (emphasis added).  Thus, "an employer's failure to engage in a sufficient interactive process does not form the basis of a claim under the ADA and evidence thereof does not allow a plaintiff to avoid summary judgment unless she also establishes that, at least with the aid of some identified accommodation, she was qualified for the position at issue."  *Id.* at 101; *see also Hunt-Watts*, 43 F. Supp. 3d at 135 ("There is consensus among the

circuit courts that, if no reasonable accommodation is available, an employer is not required to engage in a good-faith interactive process . . . . [F]ailure to engage in the interactive process, standing by itself, does not entitle a plaintiff to recovery under the ADA.") (citing *McBride*, 583 F.3d at 100-101).  Fiorillo's interactive process claim fails for at least three reasons.

First, as discussed above, Fiorillo's therapist unequivocally opined that she was unable to perform any work on October 3, 2011, and did not change his conclusion prior to Fiorillo's termination.  [Dkt. #118-1510, Ex. 10 to Defs.' Mot. at SIK0225-26].  Second, Fiorillo has failed to identify a reasonable accommodation which was available at the time she was terminated and with which the Defendants did not provide her.  *See supra* at 23-33.

Third, the record indicates that the Defendants did attempt to engage Fiorillo in an interactive process to identify reasonable accommodations on two occasions prior to terminating her and had already demonstrated their willingness to accommodate her by providing her with a host of accommodations to assist with her job.  Further, in response to several employees' requests, including Fiorillo's, to hire additional employees, David spoke with his supervisor about doing so but was told that the budget would not permit it.  [Dkt. #123-1, Pl.'s Statement of Disputed Facts at ¶ 77; Dkt. #123-4, Ex. C to Pl.'s Opp., David Dep. Tr. at 53:6-7, 14-19].  Finally, it was Fiorillo who had agreed to follow up with Sikorsky after the final discussion of accommodations and who failed to do so.

After leaving work in mid-July 2011, Fiorillo communicated with several employees of the Defendants, including Lafferty, David, and Kagdis.  Despite

receiving three letters from Lafferty and speaking with her multiple times, Fiorillo merely mentioned to Lafferty her desire that additional employees be hired to help with her job duties.  [Dkt. #123-4, Ex. B to Pl.'s Opp., Lafferty Dep. Tr. at 45:10-20].  Lafferty followed up on the request, contacting Defendant David and asking him if he could hire an additional person, but David, aware of his supervisor's earlier determination that he could not hire more people, informed Lafferty that Fiorillo's job could be handled by one person.  [*Id.* at 46:5-11].  Fiorillo also spoke with David while on leave, and did not raise any accommodations.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶¶ 45-49; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶¶ 45-49].  It was not until October 2011, three months into her leave, when Fiorillo responded to Sikorsky's repeated requests for her to discuss reasonable accommodations which would enable her to return to work.  [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo, Dep. Tr. at 103:13-16].  In her discussion with Kagdis, the two accommodations she identified were not reasonable, and she agreed to contact Kagdis after her doctor's appointment, but she never did.  [*Id.* at 183:10-25].  This last fact alone dooms Fiorillo's interactive process claim.  *See Nugent v. St. Lukes-Roosevelt Hosp. Ctr.*, 303 F. App'x 943, 946 (2d Cir. 2008) ("An employee who is responsible for the breakdown of that interactive process may not recover for a failure to accommodate.").

In light of these facts, Fiorillo's interactive process claim fails, and her failure to identify any reasonable accommodation which would have permitted

her to perform the essential functions of her job entitles the Employer Defendants to summary judgment on her ADA failure to accommodate claim.[15]

### B.  Fiorillo Fails to Offer Facts Sufficient to Support Her Hostile Work Environment Claim

In addition to refusing to provide her with a reasonable accommodation, Fiorillo contends that the Employer Defendants created and maintained a hostile work environment with respect to her gender.  [Dkt. #123, Pl.'s Opp. at 22].

To establish a claim for a hostile work environment under Title VII, a plaintiff must show that the complained-of conduct is "(1) objectively severe or pervasive; (2) creates an environment that the plaintiff herself subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's race" or membership in a different protected class.  *Goins v. Bridgeport Hosp.*, 555 F. App'x 70, 71–72 (2d Cir. 2014).  To determine whether an environment is objectively hostile or abusive, a court must "look[ ] at *all* the circumstances."  *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010) (citation and quotations omitted) (emphasis in original).

> These may include the *frequency* of the discriminatory conduct; its *severity*; whether it is *physically threatening* or *humiliating*, or a mere offensive utterance; and whether it *unreasonably interferes with*

---

[15] Even assuming Fiorillo met her burden of setting forth a *prima facie* case—which she has not—the evidence submitted by the Defendants regarding the company's tight budget constraints and its need for all of its employees to perform their jobs during a very busy time, coupled with the nature of the accommodations Fiorillo requested and her failure to rebut the defendant's hardship arguments is sufficient to establish undue hardship.  *See Frumusa v. Zweigles, Inc.*, 688 F. Supp. 2d 176, 186-87 (W.D.N.Y. 2010) ("[T]he burden of nonpersuasion on the reasonableness of the accommodation and demonstrating that the accommodation imposes an undue hardship amount to the same thing.") (quoting *Borkowski,* 63 F.3d at 138) (citations omitted).

> **an employee's work performance.** The effect on the
> employee's psychological well-being is, of course,
> relevant to determining whether the plaintiff actually
> found the environment abusive. But while
> psychological harm, like any other relevant factor, may
> be taken into account, *no single factor is required.*

*Id.* (citation and quotations omitted).

"Title VII hostile work environment claims are subject to demanding standards in order to avoid construing the statute as a general civility code." *Ghaly v. U.S. Dep't of Agric.*, 739 F. Supp. 2d 185, 196 (E.D.N.Y. 2010) (citation and quotations omitted). As a result, "[i]solated incidents generally will not suffice to establish a hostile work environment unless they are extraordinarily severe . . . [although] even a single episode of harassment, if severe enough, can establish a hostile work environment." *Kaytor*, 609 F.3d at 647 (citation and quotations omitted). However, "[c]onduct must be extreme to amount to a change in the terms and conditions of employment . . . ." *Callahan v. Buerkle*, 570 F. Supp. 2d 288, 292 (D. Conn. 2008) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Indeed, a plaintiff has not established a hostile work environment merely by showing that she was subjected "to intense scrutiny" or was criticized "more than other employees." *Alers v. New York City Human Resources Admin.*, No. 06-cv-6131 (SLT) (LB), 2008 WL 4415246, at *6 (E.D.N.Y. Sept. 24, 2008) (citing and quoting *Garone v. United Parcel Serv., Inc.*, 436 F. Supp. 2d 448, 469 (E.D.N.Y. 2006) and *Nugent v. St. Luke's/Roosevelt Hosp. Ctr.*, No. 05 Civ 5109, 2007 WL 1149979, at *9 (S.D.N.Y. Apr. 18, 2007)).

As an initial matter, in declining to grant the Employer Defendants' motion to dismiss, the Court liberally construed the Amended Complaint as alleging a

claim for a hostile work environment based on disability discrimination.  *See* [Dkt. #130, Memo. of Decision at 28 (distinguishing the cases cited by the Employer Defendants on the ground that Fiorillo's hostile work environment claim was *not* "based on a wholly different type of discrimination")].[16]

Otherwise, as the Employer Defendants correctly pointed out in their motion to dismiss, Fiorillo's hostile work environment claim would have been subject to dismissal because it was not reasonably related to the disability discrimination claim she raised before the EEOC.  *See* [Dkt. #92-1, Employer Defs.' Memo. at 8 (citing *Wright-Kahn v. People's Bank, Bridgeport*, No. 3:00-cv-2314 (JBA), 2001 WL 902653, at *2 (D. Conn. Jul. 25, 2001) (finding failure to exhaust where "[p]laintiff's sex . . . claims in her complaint  . . . [we]re not reasonably related to the mental and physical disability discrimination alleged in the EEOC charge"); *Edwards v. New York State Unified Court Sys.*, No. 12 Civ. 46 (WHP), 2012 WL 6101984, at *7 (S.D.N.Y. Nov. 20, 2012) (holding failure to exhaust disability discrimination claim where before EEOC plaintiff claimed she was discriminated against "on the basis of her race and retaliated against [] for filing a complaint with the EEOC and filing a sexual harassment suit")].[17]  Moreover, even

---

[16] The Complaint alleged that the hostile work environment was "brought about because of Plaintiff's gender," [Dkt. #71, Second Corrected Second Am. Compl. at ¶ 26], but relied exclusively on the facts underlying Fiorillo's ADA claim, which are devoid of any allegations of gender discrimination.  *See* [*id.* at ¶¶ 10-25].

[17] Indeed, the lone portion of her EEOC submission Fiorillo cites in her opposition to the Employer Defendants' motion for summary judgment to support exhaustion of her gender-based hostile work environment claim does not do so.  *See* [Dkt. #123, Pl.'s Opp. at 29, n. 26].  The cited paragraph from Fiorillo's EEOC affidavit alleged that "*a female employee*" had been promoted over her, and stated only that Sikorsky "did not have any females in management

if Fiorillo's gender-based hostile work environment claim was somehow deemed to have been exhausted, the evidence Fiorillo relies on in bringing this claim does not come close to establishing an objectively hostile work environment motivated by her gender.[18]  Accordingly, the Court evaluates her properly exhausted

---

positions."  [Dkt. #123-4, Ex. E to Pl.'s Opp. at 116 (emphasis added)].  This single stray remark regarding a lack of women in management positions is insufficient to put the EEOC on notice that Fiorillo was alleging a hostile work environment based on her gender.  *See Jiggets v. Diaz*, No. 02 Civ. 8959 (LTS) (JCF), 2009 WL 749575, at *7 (S.D.N.Y. Mar. 20, 2009) (holding that when plaintiff's EEOC charge alleged only religious discrimination, a reference to himself as a "black-male" in the charge was insufficient to put the EEOC on notice of unalleged racial discrimination claims).

[18] First, Fiorillo claimed that Sikorsky failed to hire her as a supervisor because of her gender, but then later admitted she never applied for any supervisory positions.  [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at 244:1-12, 24-25].  Second, she claimed David talked her out of applying for a supervisory position because Sikorsky had no female managers, but she later acknowledged the presence of at least two female managers.  [*Id.* at 245:25-246:9, 268:7-269:7].  Third, she baselessly claimed that she was prevented from applying to the 53K program because of her gender, but elsewhere she offered two other explanations for why David allegedly prevented her from applying, which exclusively concerned her disabilities.  [*Id.* at 220:25-221:3, 239:9-25, 283:8-9, 284:6-15].  Fourth, she claimed other Sikorsky employees, including Lafferty, Morris, and Meisner, created a hostile work environment, but she was unable to identify anything they did, other than her wholly unsupported claim that Lafferty disclosed personal information by returning documents via a fax machine located in a different facility than the one to which Fiorillo originally sent them.  [*Id.* at 279:20-281:15, 286:16-288:3].  Even if Fiorillo's speculations are correct, she offers no evidence that Lafferty's decision to share her personal information with others was motivated by either her gender or her disabilities.  Fifth, the unknown number of times in which David looked to other male employees for their opinions before accepting Fiorillo's conclusions constitute, at most, isolated incidents insufficiently serious to support a hostile work environment claim.  *See* [*Id.* at 274:12-21, 276:9-19, 278:13-18]; *Zayas v. Caring Cmty. of Connecticut*, No. 3:11-cv-442 (VLB), 2012 WL 4512760, at *7 (D. Conn. Oct. 1, 2012) (distinguishing "offhand comments" and "isolated incidents (unless extremely serious)" from "discriminatory changes in the terms and conditions").  Sixth, Fiorillo's belief that the workload was not evenly distributed and that one of her colleagues who received less work was a male is not sufficient to establish a hostile work environment based on her gender for several reasons, including Fiorillo's failure to offer any evidence for this

disability-based hostile work environment claim under the framework articulated above.

Here, whether viewed separately or together, Fiorillo's allegations are insufficient to support her claim of a hostile work environment based on her disability. First, David's pre-leave responses to her concern about the amount of work she was receiving in 2011 did not constitute such "discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Fairbrother v. Morrison*, 412 F.3d 39, 48 (2d Cir. 2005). His statements that "everybody's working" as long hours as she was, that there was "no place else" for the work to go, and that everyone "should be thankful that we're busy," are facially neutral. [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at 47:8-10, 94:20-23; 193:12-21]. Critically, Fiorillo was one of several employees who approached David about hiring more people in early 2011, but David did not grant any of their requests. [*Id.* at 192:19-193:8]. Instead, as David testified, and Fiorillo does not dispute, he went to his supervisor with his employees' requests and was informed that the company's budgets and resources were so "tight" that it could not add any additional people to the program. [Dkt. #123-1, Pl.'s Statement of Disputed Facts at ¶ 77; Dkt. #123-4, Ex. C to Pl.'s Opp., David Dep. Tr. at 53:6-7, 14-19]. Furthermore, at no point did Fiorillo tell David that her requests for additional employees had anything to do with her disabilities,

belief, the fact that one of the other over-burdened employees was, at times, a female, and the lack of evidence that the reason for the uneven distribution had anything to do with her gender. [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at 178:23-179:3, 180:18-23, 182:17-23]. Finally, Fiorillo's assertion that the Defendants' decision not to promote her since 1997 was due to her gender fails to support her claim because she simply offers no evidence to substantiate this belief. [*Id.* at 284:17-285:1].

severely undercutting any inference of discrimination based on David's refusal to act on them.

Relatedly, Fiorillo's claim that she received more work than other employees fails to establish a hostile work environment because she has not put forth any evidence to support this allegation, nor does she contend that she ever raised this concern with anyone at Sikorsky, beyond vaguely requesting an "evenly distributed workload" from Kagdis months after she began her leave. *See* [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at 178:11-17, 23-179:3, 180:18-23 182:17-23].

Next, the unspecified facial gestures and verbal tones David made in response to Fiorillo's complaints about her workload also do not evince an objectively hostile work environment for at least two reasons.  [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at 91:6-92:14].  First, Fiorillo offers no support for her subjective belief that these vague gestures and tones expressed some type of dismay and were intended to insinuate that she was whining or complaining about her work levels.  *See, e.g., Adeniji v. Admin. for Children Servs., NYC*, 43 F. Supp. 2d 407, 423 (S.D.N.Y. 1999) ("[I]t is well settled that a plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn  . . . .") (citation and quotations omitted) (finding plaintiff failed to state a *prima facie* case of national origin hostile environment discrimination).

More importantly, Fiorillo offers no facts tending to show that David's behavior was in any way related to her disability.  *See, e.g., Barnes v. CCH Corp.*

*Sys.*, No. 01 Civ. 2575 (AKH), 2004 WL 1516791, at *6 (S.D.N.Y. Jul. 7, 2004)

(granting summary judgment to defendant where plaintiff "offer[ed] no evidence

showing that" defendants' social ostracism and failure to thank plaintiff for gifts

"had any nexus with [plaintiff's] race, gender, or disease status").[19]

     Finally, Fiorillo acknowledges that she never informed David prior to going

on leave that her work levels had pushed her to the brink of a panic attack, nor

did she present him or anyone else at Sikorsky with a doctor's note advising that

her workload be reduced.  [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at

196:3-13].

     In addition to David's initial refusal to hire more employees and his facial

expressions, Fiorillo contends that David created a hostile work environment by

intentionally thwarting her pursuit of job opportunities.  Here again, Fiorillo offers

no evidence tending to show that David interfered in any way.  With respect to the

53K program, Fiorillo asserts that she met with employees of the program, who

thought she would be a good fit, but before she could apply, the posting for the

position was removed from Sikorsky's system, and a few months later, five

contract employees were hired to fill the position.  [*Id.* at 225:21-25, 229:21-

230:10].  While Fiorillo surmises that David removed the job position specifically

---

[19] For the same reason, Fiorillo's contention that David directed certain
employees to contact her while she was on vacation, without more, does not
support her claim that he did so with discriminatory intent.  *See* [Dkt. #123-3,
Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at 92:14-93:3].

to prevent her from applying, she does not offer even a shred of evidence to support her belief.  [*Id.* at 231:10-18, 239:9-18].[20]

   Similarly, her claim that David talked her out of applying for a supervisory position fails to support her hostile work environment claim for a host of reasons. [*Id.* at 245:25-246:9].  First, Fiorillo does not contend that he dissuaded her from applying on the basis of her disabilities, but rather, her gender.  [*Id.* at 268:7-14]. Second, David's asking her if she really wanted to attend all of the necessary meetings and would be willing to be on call throughout nights is, at most, ambiguous.  While the statement *could* refer to Fiorillo's disabilities (or gender), it is equally plausible that David, knowledgeable of Fiorillo's home commitments, including her disabled son, simply wished to inform Fiorillo of the extra time commitment that a supervisory position demanded so she could determine for herself whether to apply.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶¶ 12-13; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶¶ 12-13].  His conduct was in no way egregious; David did not threaten or verbally abuse her, demean or humiliate her

---

[20] Even assuming David did take it down, neither of the two explanations Fiorillo offers for this action establishes discriminatory intent.  First, without any support, Fiorillo claims that David prevented her from applying because her work hours and work schedule did not conform to the program's job requirements.  [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at 220:24-221:3].  Even if Fiorillo offered some evidence to establish this, which she does not, the reason itself is legitimate and non-discriminatory.  That the reason touched upon an accommodation she received for a disability does not automatically render it discriminatory, at least where, as here, the accommodation prevented her from fulfilling some of the job's essential tasks. Second, she claims he took the posting down because he generally disapproved of her modified work hours accommodation.  [*Id.* at 239:9-25]. However, she does not offer any facts to support her subjective belief that his general disapproval of this accommodation had anything to do with why he took it down.  [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at 238:18-19, 239:23-25].

by informing her of the responsibilities of the position she was considering. Third, Fiorillo offers no evidence that David prevented her from obtaining a supervisory position by simply pointing out the responsibilities of the position so that she could make an informed decision to apply or not to apply.  Indeed, Fiorillo admits that she never applied for any supervisory positions.  [*Id.* at 244:24-25].

Following her leave of absence, Fiorillo claims she and David had a contentious phone call, during which David yelled, "what is going on" at her, and stated that he was unsure what he was going to do with her job.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶¶ 46-47; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶¶ 46-47].  While it is undoubtedly unpleasant to be yelled at, the statement he made was facially neutral, and this was the sole instance David yelled at her.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 48; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 48].  It is a single, isolated and relatively benign incident which alone cannot support a hostile work environment claim.  *See Lewis v. New York Homes & Cmty. Renewal*, No. 15 Civ. 5478 (BMC) (RLM), 2015 WL 5695643, at *3 (E.D.N.Y. Sept. 28, 2015) ("A single incident of yelling is hardly, if ever, sufficiently pervasive to create an 'environment' of hostility.").  Moreover, that David was unsure of what he was going to do with her job makes perfect sense and was far from objectively severe, given that Fiorillo did not on this call, or at any point thereafter, inform anyone at Sikorsky of her anticipated return date.

Similarly, David's assertion that the mere fact Fiorillo's doctors had submitted paperwork in support of her application for short-term disability

benefits did not guarantee that her request would be approved, while, perhaps, insensitive, was both facially neutral and factually correct.  [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶ 49; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶ 49].  This statement is simply an informative statement of fact which is in no way critical, humiliating, demeaning, abusive or threatening, and therefore cannot support a hostile work environment claim.

Finally, the letters Fiorillo received and the phone calls she had with Lafferty and Kagdis are insufficient to support her hostile work environment claim because they were not objectively hostile, nor were they sufficiently severe, and they were made in response to Fiorillo's silence as to when she would be able to return to work.  Neither Fiorillo nor her doctors ever informed anyone at Sikorsky that she considered these communications to be harassing.  Sikorsky's communications also were not excessive in number, given that Fiorillo took an unannounced leave of absence in mid-July 2011, the first communication initiated by anyone at Sikorsky was the September 13, 2011 letter, and *Fiorillo* initiated many of the communications she had with Sikorsky during her leave, including the August 2011 calls with Lafferty and David and the September 2011 call with Lafferty following her receipt of Lafferty's second letter.  *See* [Dkt. #119, Defs.' Rule 56(a)(1) Statement at ¶¶ 42, 45, 55; Dkt. #123-1, Pl.'s Rule 56(a)(2) Statement at ¶¶ 42, 45, 55].  Indeed, over the roughly four month period Fiorillo was away from work prior to her termination, members of Sikorsky reached out to her four times, three times by letter, and once by phone, when Ms. Kagdis called Fiorillo in

October 2011 regarding any accommodations she would need in order to return.[21]

These communications were expressly designed to both elicit an interactive

discussion of reasonable accommodations and inform Fiorillo of the

consequences of her continued inability to return to work. Sikorsky was legally

obligated to engage in these interactive discussions for Fiorillo's benefit, with the

objective of affording Fiorillo a fair opportunity to return to work and keep her

job.  No reasonable juror could find that neutral requests to engage in a

collaborative process required by law exceeded the bounds of conduct usually

tolerated by decent society.  Nor could such a jury find that such entreaties to

engage in a job-preserving dialogue were especially calculated to cause severe

emotional distress.  For these reasons Fiorillo's hostile work environment claim

fails.

### C.  Fiorillo's Intentional Infliction of Emotional Distress Claim Fails

To establish a claim for intentional infliction of emotional distress under

Connecticut law, the plaintiff must show that: (1) the actors involved intended to

inflict emotional distress or that the actor knew or should have known that

emotional distress was the likely result of the actor's conduct; (2) the conduct

was extreme and outrageous; (3) the defendant's conduct caused he plaintiff's

distress; and (4) the emotional distress the plaintiff sustained was severe.  *Oliver*

*v. Waterbury Bd. of Educ.*, No. 3:12-cv-01285 (VLB), 2014 WL 1246711, at *19 (D.

Conn. Mar. 24, 2014).  "Liability for intentional infliction of emotional distress

---

[21] The record is unclear whether Fiorillo or David initiated the email exchange that
occurred between them in September 2011, although it is clear that both sent
and received emails.  *See* [Dkt. #123-3, Ex. A to Pl.'s Opp., Fiorillo Dep. Tr. at
70:5-20, 202:20-203:3].

requires conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind. *Id.* "Conduct . . . that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." *Id.*

As discussed above, taken separately or together, the conduct by the Employer Defendants simply was not extreme or outrageous.  At most, Fiorillo offers unsupported inferences of discriminatory intent, a single instance in which her supervisor yelled at her, and a handful of ambiguous statements which, at most, display bad manners. *Cf. Pottie v. Atl. Packaging Grp. LLC*, No. 3:12-cv-773 (WIG), 2012 WL 6087282, at *1 (D. Conn. Dec. 6, 2012) (finding plaintiff stated a claim for intentional infliction when she alleged "[s]he was subject to a course of verbal abuse and profanity, including being referred to by derogatory names and asked what banana boat she came off, a remark insulting her national origin and ethnicity . . . . She was ridiculed about her appearance in a sexually demeaning manner.  She was physically struck in the head and face with a hand, box or other items").  No reasonable jury could find that Sikorsky's conduct towards Fiorillo was extreme or outrageous.  Nor could a reasonable jury find that its attempts to engage Fiorillo in an interactive dialogue to identify a reasonable accommodation which would enable her to return to work as required by law was done intentionally to cause her emotional distress.  Surely, informing an employee of the possibility of termination would cause stress, but that stress is the unavoidable consequence of engaging in a dialogue which had the potential to

help the employee keep their job; however, an employer cannot be said to intentionally inflict emotional distress by engaging in a legally mandated discussion designed to enable the employee to save their job.   *See Newtown v. Shell Oil Co.*, 52 F.Supp.2d 366, 375 (D. Conn. 1999) (holding that employer's subsequent notifying of employee that her employment was terminated did not support claim of intentional infliction of emotional distress).

IV.   Conclusion

For the foregoing reasons, the Employer Defendants' Motion for Summary Judgment is GRANTED.  Plaintiff's Complaint is DISMISSED with prejudice.  The Clerk is directed to enter judgment in favor of the Defendants and to close the case.

IT IS SO ORDERED

_____/s/_____
Vanessa L. Bryant,
United States District Judge

49